Filed 7/16/26  In re L.M. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| IN RE L.M. et al, Persons Coming Under the Juvenile Court Law. | 2d Juv. No. B350540 (Super. Ct. No. 25JV00342, 25JV00343, & 25JV00344) (Santa Barbara County) |
| SANTA BARBARA COUNTY CHILD PROTECTIVE SERVICES,<br><br>    Respondent,<br><br>v.<br><br>C.M.,<br><br>    Appellant. | |

C.M., father, appeals the juvenile court's disposition order removing his three children from his custody.  The children, L.M., then age 14, O.M. then age 10, and V.M. then age 8, were removed after the court sustained allegations that the parents'

domestic violence, the father's untreated mental health symptoms, and the ongoing family law custody disputes have caused the children to suffer or be at risk of suffering serious physical and emotional harm. We agree with father that the juvenile court failed to state facts to support its finding that reasonable efforts were made to prevent or eliminate the need to remove of the children, but we conclude any error was harmless as substantial evidence supports the court's findings. We will affirm.

SUMMARY OF FACTS AND PROCEDURAL HISTORY

Mother and father lived together with their children until sometime in approximately late 2023 or early 2024. During the time they were together the children were exposed to multiple incidents of domestic violence causing them to feel "sick" and "really scared."

Mother moved out of the home and obtained a temporary restraining order against father in late 2023 or early 2024. In March 2024, however, she moved back into the family home where she stayed until approximately August 2024 when she again moved out after father assaulted her.

Custody of the children was a matter of intense disagreement between the parents in family law court proceedings. Apparently, in early 2025 the family law court granted custody of the children to father and may have also limited mother's contact.[1]

---

[1] The record on appeal includes only one family court minute order dated July 23, 2025. The juvenile court did not take judicial notice of any other document in the family court file. We are limited to relying upon what the parties and others have

2

Concerns about the children's safety resulted in the family law court making two referrals to the juvenile court. After the second referral in about July 2025, the Santa Barbara County Department of Social Services filed Welfare and Institutions Code section 300[2] petitions for all three children and obtained juvenile court orders detaining them from the custody of both parents.

*Father's Allegations*

Father has made many outlandish and unsupported allegations which he has shared with the children. He has accused the mother of poisoning him and the children with arsenic she put in cupcakes. Father has repeatedly told medical officials, law enforcement, school officials and social workers that his children's medical issues are the result of their having been poisoned by their mother.

Father also believes the paternal step-grandfather has poisoned the children with arsenic laced food. He has instructed the children they may not consume food prepared by the grandfather.

Father claims the mother has tried to kill him by smothering him with a pillow, by hiring someone to shoot him, and by dumping his body in a riverbed.

Father contends mother tried to kill their son, L.M., with poison when he was a baby by feeding him a silica packet.

---

reported, at times inconsistently, about the family law court proceedings.

[2] Undesignated statutory cites are to the Welfare and Institutions Code.

*Mother's Allegations*

Mother reported years of physical abuse by father. Mother reported to law enforcement in February 2025 that during their relationship father raped and sodomized her, prevented her from leaving the home, threatened to make false reports about her to the police, and threatened to kill her and take the children if she reported him to law enforcement.

Mother alleges in August 2024 father was raping her when their son came into the room complaining that mother's crying was scaring the two youngest children. Mother moved out of the home shortly thereafter.

Mother began accusing father of poisoning the children with arsenic and then blaming her.

*Children's Statements*

The children have given detailed accounts of the alleged arsenic poisoning by mother. Their descriptions closely resemble what father has reported. O.M. states the parents would argue a lot, and she could not recall a time when their relationship was good. She felt scared and sad when her parents fought because they would yell and her mother would hit her father.

V.M. stated her mother tried to poison her with rat poison in cupcakes. V.M. stated when the parents lived together she did not like that they "fought all the time" and that they would "fight about her and her siblings."

O.M. and V.M. were diagnosed with anxiety and were participating in therapy.

L.M. believes the juvenile case was filed due to mother's poisoning them with the arsenic laced cupcakes. L.M. also believes mother tried to put him in juvenile hall because he did

4

not believe her when she denied poisoning them.  He knows this because father told him.

School records for the two youngest children revealed one had 45 and the other had 34 unexcused tardies between August 2024 and June 2025.  Some records reflect father kept the children out of school due to poisoning.

*Prior Child Welfare Referrals and Interventions*

There were approximately 22 calls for service to law enforcement by the family since January 2024.  The calls reported sexual battery, poisoning and custody disputes.

There have been approximately 15 to 20 prior child welfare referrals since 2011.  The more recently investigated referrals beginning in January 2024 alleged the mother hitting the children, domestic violence including yelling and fighting, the mother poisoning the children, and father's paranoia.  All of the referrals were closed as inconclusive.  The parents were given a referral for counseling for the children "as it was apparent that the children would benefit from this."  The Department attempted to schedule a Child and Family Team Meeting[3] but father declined to attend if mother was present.

In January 2025, the family law court requested a Probate Code section 1513 assessment due to the parents' allegations regarding domestic violence, poisoning of the children, and

---

[3] The "'Child and Family Team'" is "a group of individuals who are convened by the placing agency and who are engaged through a variety of team-based processes to identify the strengths and needs of the child or youth and their family, and to help achieve positive outcomes for safety, permanency, and well-being."  (§ 16501, subd. (a)(4).)

mother hitting the children.[4]  The investigation was closed as
"[i]nconclusive."

A referral in April 2025 stemmed from father taking V.M.
to the hospital emergency room because he was concerned mother
and "her partner" had poisoned her with arsenic.  The
investigation was closed "[u]nfounded" after it was determined
the medical tests did not show any arsenic in the child's system,
and that mother and "her partner" did not have access to the
child.

*Detention*

After a "referr[al]" from the family law court in July 2025,[5]
the Department filed WIC 300 petitions for all three children.
The children were detained from both parents and placed with
the paternal grandparents.

Father contested the detention of his children arguing the
children should be placed with him.  The court heard testimony
from a social worker, mother, and father.  The court found a
prima facie showing of jurisdiction, and ordered the children

_____

[4] Probate Code, section 1513, concerns investigations and
reports required when a probate guardianship over minor
children is sought.  Subdivision (b) provides that if the proposed
ward is or may be subject to Welfare and Institutions Code,
section 300, the court may refer the matter to the local child
welfare agency to initiate a section 329 investigation.  A social
worker who receives a Probate Code section 1513 referral, must
immediately investigate to determine whether juvenile court
proceedings should be commenced.  (§ 329, subd. (b).)

[5] It is unclear whether this was a standard child welfare
referral, an application to commence juvenile court proceedings
under section 329 or Probate Code section 1513, or something
else.

6

detained from both parents.  It also ordered the parents receive alcohol and drug testing and "[p]arenting education" pending further proceedings.

*Jurisdiction and Disposition*

Father contested jurisdiction and the Department's recommendation that the children be removed from his custody. At the contested hearing, the juvenile court considered the social workers' detention and combined jurisdiction and disposition reports, law enforcement and medical reports, and testimony from the social worker, father and mother.

Father testified, repeating much of what was reported in the medical, law enforcement and social worker's reports about mother poisoning and attempting to kill him and the children with arsenic.  He said he knew she had poisoned him because he was "bleeding out my eyes, bleeding out my skin, I was cold, I was weak, I couldn't move" and mother admitted she poisoned him.  He states mother has tried to poison him with arsenic "at least three" times.  He also repeated his allegations she tried to suffocate him with a pillow.

Father also explained mother and grandfather have "had relations" and "they are the ones that ultimately started the whole poisoning of – targeting me but ultimately my children fell prey to their shenanigans."  He stated he took V.M. to the emergency room in April 2025 after she exhibited symptoms consistent with arsenic poisoning and that O.M. had similar symptoms.

Father contends despite his repeated reports of mother's poisoning to law enforcement, they have never followed up.  As a result, he "started making a plan on how to move out with my

7

children safely" and he thereafter made all the food for the children.

Father denied having anger issues, and having any fault in the parents' history of domestic violence because "I'm actually very calm and collected."

Mother testified father has physically abused her "multiple times." She obtained a temporary restraining order against father after he attacked her while she was sleeping. He physically prevented her from attending the hearing on the permanent restraining order in March 2024. She stated father enlisted L.M.'s help in keeping her in the home. She eventually moved out of the home because "during one of the times [father] was raping" her, L.M. came to the door to complain that her crying was too loud and she was "scaring the girls."

*Juvenile Court Findings and Orders*

After the parties argued, the juvenile court sustained the petition allegations. The court sustained section 300 subdivision (b) and (c) counts, finding the children have suffered, or there is a substantial risk that the children will suffer, serious physical harm or illness, and emotional distress and anxiety as a result of the parents' conduct. The court found true that there were concerns of ongoing domestic violence between the parents causing the children to express feeling sad and scared, that the children report mother is mean and they do not like her, accusations that the parents are poisoning the children, and that father has untreated mental health symptoms evidenced by his taking the children to doctors based on his belief mother has poisoned them and by his repeated reports that mother and grandfather have attempted to murder him and the children, and

8

by his paranoia about the children being poisoned causing him to restrict the children's ability to eat food prepared by others.

In its oral ruling the court stated the "domestic violence issue" had been an "ongoing pattern for quite some time" and that the pattern would continue "without some intervention." The court also found the facts support that the children are afraid of their mother, the parents "have a pattern of behavior that if it continues, there's no indication that it will stop at this point, that when it continues will place the children at substantial risk of suffering emotional damage. I think while not making a finding the children are suffering emotional damage at this time, I'm certainly making a finding that there's a substantial risk presented to the children of suffering serious emotional damage. There's already a hint of that among the children based on their concerns. And I think the repeated insistence by the father, at least, that they're being poisoned, I think the reasonable inference as to [O.M.] is that she feels scared and sick of domestic violence, she thinks mom is mean, and the subjecting the children to unneeded medical treatment certainly places them in some risk of physical damage and also serious emotional damage."

The court then turned to disposition and found the "Agency has complied with the case plan by making reasonable efforts to return the children to a safe home."

In its written orders, the court found that reasonable efforts had been made to prevent or eliminate the need to remove the children and that there was clear and convincing evidence to support the circumstances necessary to remove the children under section 361 subdivision (c)(1).

9

DISCUSSION

Father challenges the court's removal order on procedural and substantive grounds. Procedurally he contends the Department's reports failed to discuss the reasonable efforts and the juvenile court failed to state facts supporting its finding that reasonable efforts were made to prevent or eliminate the need for the children's removal from his custody. Substantively, he argues there is no substantial evidence in the record that could justify the court's removal order. While we agree with one of his procedural contentions, we disagree that there is no substantial evidence and conclude any error was harmless.

"A dependent child shall not be taken from the physical custody of [his or her] parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . . [¶] (1) [That t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . custody." (§ 361, subd. (c)(1).)

The court is required to consider specified "reasonable means" including "[t]he option of removing an offending parent, guardian, or Indian custodian from the home." (§ 361(c)(1)(A).)

The juvenile court must "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from [his or her] home" and "shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)

"We review a dispositional order removing a child from a parent for substantial evidence, "'keeping in mind that the trial

10

court was required to make its order based on the higher standard of clear and convincing evidence.'" (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.) In applying this standard of review, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Id.* at pp. 995-996.) "[We] view the record in the light most favorable to the prevailing party . . . and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.*at p. 996; *In re M.V.* (2022) 78 Cal.App.5th 944, 960.)

A party challenging the court's orders has the burden of demonstrating error. (*In re D.C.* (2015) 243 Cal.App.4th 41, 55.)

If the child welfare agency recommends removal, its social study must include "[a] discussion" of the reasonable efforts it has made to prevent or eliminate the need to remove the children. (Cal. Rules of Court, rule 5.690(a)(1)(B)(i).)

We agree with father that here the social worker's reports are mostly devoid of any discussion of the efforts they undertook to eliminate the need to remove the children. But father failed to raise this objection in the juvenile court where it could have been addressed. We therefore find his claim forfeited. (*In re G.C.* (2013) 216 Cal.App.4th 1391, 1398-1399.)

We also agree that the juvenile court's ruling on disposition merely stated its conclusory findings that reasonable efforts had been made but it did not state any facts upon which this finding was based. Findings that merely repeat the statutory requirements are not a replacement for a statement of case specific facts that support that finding. (*In re D.P.* (2020) 44

11

Cal.App.5th 1058, 1067.) "'[O]ur dependency system is premised on the notion that keeping children with their parents while proceedings are pending, whenever safely possible, serves not only to protect parents' rights but also children's and society's best interests.'" (*In re Henry V.* (2004) 119 Cal.App.4th 522, 530.) The requirement for a discussion by the child welfare agency of its reasonable efforts to prevent or eliminate removal (Cal. Rules of Court, rule 5.690(a)(1)(B)(i)) and a statement by the court of the facts supporting removal (§ 361, subd. (d)), play important roles in this scheme. Without those safeguards there is a danger the agency's declarations that there were "'no reasonable means' other than removal 'by which the [children's] physical or emotional health may be protected' and that 'reasonable efforts were made to prevent or to eliminate the need for removal' can become merely a hollow formula designed to achieve the result the agency seeks." (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 810.)

Again, father did not raise this issue in the juvenile court and we could find his claim is forfeited but we exercise our discretion to reach the merits.

We conclude any error was harmless because substantial evidence supports the juvenile court's findings and it is not reasonably probable the juvenile court would have reached a result more favorable to father in absence of the error. (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218; *In re L.O.* (2021) 67 Cal.App.5th 227, 247.)

In his brief, father admits the "primary danger to the minors arose out of the intensely disputed family law matter and the emotional harm they suffered because of their parents' dysfunctional relationship." Before and after the family law

12

court proceedings began, father participated in numerous investigations triggered by reports of domestic violence and poisoning. Social workers and law enforcement have intervened numerous times. He has met with medical professionals about his concerns the children have been poisoned. Father reports he had been attending therapy since November 2024. Yet despite all of these interventions, he continues to deny being the aggressor in the violent incidents with mother, he continues to assert mother and grandfather are poisoning him, and that mother has attempted to murder him and the children. He shares these and other unfounded beliefs with the children. The juvenile court could reasonably conclude this behavior would continue unabated until father began to participate in services and that the risk to the children would not be alleviated until then. (See *In re L.O.*, *supra*, 67 Cal.App.5th at p. 238; *In re V.L.* (2020) 54 Cal.App.5th 147, 156 ["A parent's denial of domestic violence increases the risk of it recurring"]; *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"].)

Father contends the court could have allowed the children to remain with him and ordered the parents to not have contact. But that would not address his repeated unfounded accusations against mother and grandfather which he shares with the children.

Father suggests the children could be kept safe in his home with frequent unannounced social worker visits. But because "[u]nannounced visits can only assess the situation . . . at the time of the visit" (*In re A.F.* (2016) 3 Cal.App.5th 283, 293), the court could reasonably conclude that such visits would not alleviate the risk to the children.

We conclude substantial evidence supports the juvenile court's findings.

DISPOSITION

The juvenile court's October 27, 2025 disposition orders are affirmed.

<u>NOT TO BE PUBLISHED</u>

CODY, J.

We concur:

YEGAN, Acting P. J.

BALTODANO, J.

Gustavo E. Lavayen, Judge
Superior Court County of Santa Barbara

_____

Melissa A. Chaitin, under appointment by the Court of Appeal, for Appellant.

Rachel Van Mullem, County Counsel, Lisa A. Rothstein, Senior Deputy Counsel, for Respondent.